USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lewis,

                   Plaintiff,

        –v–

ANSYS, Inc.,

                  Defendant.

19-cv-10427 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff brings claims against his former employer for discrimination, retaliation, and defamation under federal and state law. Defendant moves the Court to dismiss Plaintiff's complaint and enforce an arbitration provision contained in Plaintiff's stock incentive plan, or in the alternative, to dismiss or transfer for *forum non conveniens*, improper venue, or lack of personal jurisdiction. For the reasons that follow, Defendant's motion to compel arbitration is GRANTED.

## I.    BACKGROUND

### A.  Factual Background

The following facts are drawn from Plaintiff's complaint, as well as the parties' briefs and attached exhibits, and are undisputed unless otherwise stated.[1] Plaintiff is a 55-year old male. *Id.* ¶ 1. On September 12, 2018, Plaintiff accepted an offer of employment in a senior leadership position with Defendant. *Id.* ¶ 14. In October 2018, Plaintiff was brought on as "Vice

---

[1] As discussed *infra* II.A, the Court may consider some materials that are outside of the complaint in ruling on a motion to compel arbitration.

president, Americas Sales." *Id.* ¶ 17.  Plaintiff moved from San Francisco, California, to

Canonsburg, Pennsylvania for his employment with Defendant. *Id.* ¶ 15.  Throughout his

employment, however, he worked from his home located in New York at minimum one day a

week. *Id.* ¶ 16.

Defendant's employment offer letter later stated that he was being offered a "restricted

stock unit (RSU) grant" that was valued at $450,000. *Id.* ¶ 14.  The letter also indicated that

Plaintiff would be part of the Executive Long Term Incentive Plan (ELTIP), which would allow

him to receive additional RSU's and "performance stock units" (PSUs). *Id.*  Plaintiff was told

that the RSUs he was to receive as a part of the ELTIP would equal twice his base salary and that

he would receive them in the April-May 2019 timeframe. *Id.* (According to Plaintiff, Defendant

never provided Plaintiff the ELTIP RSUs, which equated to a loss of $720,000). *Id.*

The RSUs were provided to Plaintiff through two "Unit Award Notice Agreements,"

(hereinafter "the Agreements") which Defendant submitted as an exhibit attached to its brief.

Dkt. No. 19-2, 19-3.   The first agreement is titled the "Fourth Amended and Restated" plan,

which was to confer 576 Units on March 3, 2019, and the second is titled the "Fifth Amended

and Restated" plan, which was to confer 2,305 Units on March 3, 2019. *Id.*

The Unit Award Agreements have very similar structures.  Both state that the participant,

with Plaintiff's name listed, will be "awarded" the RSUs "subject to the terms and conditions of

the Plan." *Id.*  The Agreements then list those terms and conditions in numbered format – 17 for

the Fourth Unit Award Agreement and 19 for the Fifth Unit Award Agreement, with titles for

each term or condition underlined. *Id.*  For example, both agreements included conditions that

upon termination an employee will automatically forfeit the right to receive RSUs, as well as a

typical non-compete clause. *Id.*  Importantly for this case, condition number 11 of the Fourth

Stock Agreement and condition number 13 of the Fifth Stock Agreement contain a provision

titled "Mandatory Arbitration."  In addition to a number of arbitration-related conditions, the

provision in each agreement states in relevant part that:

> "The Participant and the Company agree that any dispute or claim arising out of
> or in any way related to (i) the Participant's employment with the Company,
> and/or (ii) this Agreement or any breach hereof, this Award, the Plan and/or any
> actions taken under the Plan, to the fullest extent permitted by law, shall be
> submitted to and resolved by confidential, binding arbitration by a single, neutral
> arbitrator. . ."

Dkt. No. 19-2, ¶ 11; Dkt. No. 19-3, ¶ 13.  Defendant claims that the Agreements were

sent to plaintiff electronically.  Dkt. No. 28 at 7-8.  In order for Plaintiff to receive the stock unit

award, Defendant claims that Plaintiff was required to log into his E*TRADE account.  Dkt. No.

29 at 2.  Once logged into E*TRADE, Defendant claims that employees are required to open the

Agreement (and cannot accept the award until they do so) and are presented with the following

directions:

> "click to open and review each of the grant documents below, then accept of
> decline the grant.  By clicking Accept, you agree to the terms and conditions of
> the Restricted Stock Units below.  If you do not agree to the terms and conditions,
> click decline."

Dkt. No. 29 at 2.   Defendant claims that Plaintiff accepted the Agreements through this

process on March 30, 2019.  Dkt. No. 21 at 7.  Defendant attached as an exhibit a "screenshot" of

a webpage as a purported record of Plaintiff's acceptance of the Agreements through this

process.  Dkt. No. 19-4.  Defendant also attached as an exhibit a purported email conversation

between Plaintiff and an employee of Defendant.  In the conversation Plaintiff purportedly was

instructed how and when to access the award through his E*TRADE account.  Dkt. No. 30-1.

Defendant's representatives submitted sworn affidavits attesting that these documents are true

and correct copies. Dkt. No. 19, 30.

Throughout his employment, Plaintiff claims he performed his job duties in an exemplary matter and exceeded his targets for each quarter.  Dkt. No. 11 ¶ 17.  In May 2020 Defendant abruptly terminated Plaintiff's employment, despite the fact that Plaintiff received a raise and positive reviews from supervisors in the months prior.  *Id.* ¶ 19-22.  The purported basis for termination was that Plaintiff "did not fit the culture" at the company and that Plaintiffs' colleagues had made complaints.  *Id.*  According to Plaintiff, however, these complaints were "manufactured" because of those colleagues' personal gripes with Plaintiff and were unrelated to his performance.  *Id.*  Plaintiff claims that Defendant's decision to terminate his employment was due to its discriminatory animus against him on the basis of his male gender.  *Id.* ¶¶ 25-26.

By letter dated May 28, 2019, Defendant provided Plaintiff with a severance package.  *Id.* ¶ 27.  On June 6, 2019, Plaintiff's counsel sent Defendant a letter stating Plaintiff's intent to commence formal gender discrimination and wrongful termination proceedings against Defendant.  *Id.* ¶ 28.  On July 22, 2019, Plaintiff filed a complaint with the Equal Employment Opportunity Commission.  *Id.* ¶ 29.  Counsel for Defendant then informed Plaintiff that Defendant would no longer offer the severance package to Plaintiff.  *Id.* ¶ 30.

## B.  Procedural Background

On November 8, 2019, Plaintiff filed a complaint against Defendant in this Court.  Dkt. No. 3.  Plaintiff's First Amended Complaint, the operative complaint in this matter, brings claims against Defendant for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000-2, N.Y. Executive Law § 296, and N.Y.C. Administrative Code § 8-107 for Plaintiff's purportedly unlawful termination and Defendant's decision to deny him a severance package after he complained of discrimination.  Dkt. No. 11.  Plaintiff also brings a

4

claim for defamation against Defendant for falsely stating to third-parties that Plaintiff's employment was terminated based on poor performance. *Id.* Defendant has filed a motion to compel arbitration, dismiss or transfer the case under the doctrine of *forum non conveniens*, or dismiss for improper venue or lack of personal jurisdiction. Dkt. No. 21.

## II.    DISCUSSION

Before the Court are Defendant's motions to compel arbitration, dismiss or transfer the case under the doctrine of *forum non* conveniens, or dismiss for improper venue or lack of personal jurisdiction. A federal "court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (holding that a Court may resolve a *forum non conveniens* motion before subject matter jurisdiction) (quotations omitted). Courts in this district will resolve a motion to compel arbitration prior to resolving a motion to dismiss for lack of personal jurisdiction. *See Ramasamy v. Essar* Glob. Ltd., 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011). *Cf. Trustees of Laundry, Dry Cleaning Workers & Allied Indus. Health Fund, Workers United v. FDR Servs. Corp. of New York,* No. 17 CV 7145 (VB), 2019 WL 4081899, at *2 (S.D.N.Y. Aug. 28, 2019) (resolving a motion to compel arbitration before a motion to dismiss for lack of subject matter jurisdiction). Because the Court will grant Defendant's motion to compel arbitration, the Court need not address Defendant's additional motions.

Defendant seeks to compel Plaintiff to arbitrate his claims under the Federal Arbitration Act in light of the arbitration clauses contained in Plaintiff's stock incentive plans. The Federal Arbitration Act requires that any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract."  9 U.S.C. § 2.  The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate" and reflects the "liberal federal policy favoring arbitration agreements."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (citations omitted).  Therefore, "federal courts [are] to enforce privately made agreements to arbitrate as they would any other contract."  *Nunez v. Citibank, N.A.*, No. 08 CV 5398 (BSJ), 2009 WL 256107, at *2 (S.D.N.Y. Feb. 3, 2009) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985)).

When presented with a motion to compel arbitration, the Second Circuit has instructed that districts courts "first . . .  must determine whether the parties agreed to arbitrate," then "must determine the scope of that agreement," and then "if federal statutory claims are asserted, . . . must consider whether Congress intended those claims to be nonarbitrable."  *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (citing *Mitsubishi Motors Corp.,* 473 U.S. at 625).

In deciding whether to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).   "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  *Id.* (citing 9 U.S.C. § 4.).  In deciding whether there is a genuine issue of fact as to whether the parties agreed to arbitrate, courts are to "consider[] all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits . . .  and draw[] all reasonable inferences in favor of the non-moving party."  *Meyer v. Uber Techs., Inc*., 868 F.3d 66, 74 (2d Cir. 2017) (quotations and citations omitted).

In the event the Court decides that all of the claims must be referred to arbitration, and a stay is requested, the Court must issue a stay. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015). However, "when a stay is not requested, the district court has discretion in determining whether to stay or dismiss the case pending arbitration." *Charter Commc'ns, Inc. v. Garfin*, No. 20 CIV. 7049 (KPF), 2021 WL 694549, at *14 (S.D.N.Y. Feb. 23, 2021) (citing *Benzemann* v. *Citibank N.A.*, 622 F. App'x 16, 18 (2d Cir. 2015)). Nonetheless, "courts in this Circuit regularly stay, rather than dismiss, complaints subject to an arbitration agreement." *Id.*

Applying these principles, the Court determines that there is no genuine dispute of fact that the parties entered into a valid agreement to arbitrate under New York law, that the agreement is subject to the FAA, and that the terms of that agreement cover all of the claims in Plaintiff's complaint. Therefore, the Court will compel arbitration.

### A.  The Parties Agreed to Arbitrate

While the FAA creates a "presumption in favor of arbitration," that presumption does not apply to the threshold issues of "whether an agreement to arbitrate has been made" in the first place. *Applied Energetics, Inc. v. NewOak Capital Markets, LLC,* 645 F.3d 522, 526 (2d Cir. 2011). "[Q]uestions of contractual validity," such as those "relating to the unconscionability of the underlying arbitration agreement," must "be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). Therefore, in determining whether the parties executed a valid arbitration agreement, the Court must "generally apply state-law principles that govern the formation of contracts." *Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 48 (2d Cir. 2000).

In terms of which state's law should apply in determining the validity of the agreement, the Court need not perform a rigorous choice-of-law analysis. Because the parties both apply New York law in their briefs, *see* Dkt. No. 28 at 6, Dkt. No. 29 at 3, the Court will look to New York law to resolve the question whether the parties agreed to arbitrate. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

In assessing whether the mandatory arbitration provisions in the Agreements are valid contracts under New York law, the Court must consider (1) whether Plaintiff ever received the Agreements and accepted the stock awards through his E*TRADE account, (2) whether that process constituted a valid contract under New York law, and (3) whether the arbitration provisions are nonetheless unenforceable due to unconscionability.

### 1. Plaintiff received the Agreements and accepted the stock award electronically

The Court must begin with the threshold factual issue of whether Plaintiff received and accepted the Agreements electronically. Plaintiff does not admit – nor does he deny – that he received and accessed the Agreements through his E*TRADE account and that, after being prompted to click "accept" if he accepted the terms and conditions, he clicked "accept." Instead, Plaintiff argues that Defendant has not demonstrated this set of facts. *See* Dkt. No. 28 at 7-8. (arguing "it cannot be 'conclusively presumed' that Plaintiff knew of the contents of the Unit Award Agreements" because "it cannot be established that Plaintiff ever received the Unit Award Agreements in the first place.").

The Court concludes, based on the whole record before it, that there is no genuine dispute of fact on this issue. For a motion to compel arbitration, just like for summary judgment, the

moving party must meet their "initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.,* 380 F. App'x 22, 24 (2d Cir. 2010).  Through the aforementioned exhibits and sworn affidavits, Defendant has presented sufficient evidence demonstrating that Plaintiff was sent the Agreements electronically, that Defendant instructed Plaintiff on how to access them, and that Plaintiff did in fact access the Agreements and click "accept" when prompted.

Then, "[i]f the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact." *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011).  *See DuBois v. Macy's E. Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009) ("[A] party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of its claim in order to precipitate the trial contemplated by 9 U.S.C. § 4.") (quotations omitted).  While Plaintiff does not expressly admit to receiving the documents electronically, Plaintiff also does not deny that he received these documents, let alone present evidence to the contrary.  Considering that "merely referring to a fact as 'disputed'" without any evidence "is insufficient to create a *genuine* dispute of fact," failing to dispute the fact at all does not either.  *Sullivan as Tr. of Stone Setters Local 84 Pension Fund, et al., v. Prestige Stone & Pavers Corp.*, No. 16CV3348 (AT) (DF), 2020 WL 2859006, at *9 n.9 (S.D.N.Y. Feb. 4, 2020).  Therefore, the Court determines there is no genuine dispute of fact as to whether Plaintiff received and accessed the documents through the process described by Defendant and clicked "accept."

### 2.  The electronic acceptance process constituted a valid agreement under New York law

Having concluded that there is no genuine dispute in this record that Plaintiff received the Agreements electronically and accepted the stock award through the E*TRADE platform, the

Court must determine whether Plaintiff's participation in that process constituted a valid agreement to arbitrate under New York law.

Under New York law, "[a]n arbitration agreement 'must be clear, explicit and unequivocal and must not depend upon implication or subtlety." *Bar-Ayal v. Time Warner Cable Inc.*, No. 03 CV 9905 KMW, 2006 WL 2990032, at *8 (S.D.N.Y. Oct. 16, 2006) (citing *Waldron v. Goddess*, 61 N.Y.2d 181, 183-84 (1984)).  However, "[t]here is no requirement that the writing be signed so long as there is other proof that the parties actually agreed on it."  *Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 35 N.Y.2d 291, 299, 319 N.E.2d 408, 412 (1974) (quotations omitted).  Moreover, if a party signs or "otherwise assents" to an agreement with an arbitration provision, they will be bound by it even if they did not read it.  *Bar-Ayal*, 2006 WL 2990032, at *8 (quoting *Tsadilas v. Providian Nat. Bank*, 786 N.Y.S.2d 478, 480, 13 A.D.3d 190, 190 (1st Dep't 2004)).

Additionally, there is no general aversion to electronically executed arbitration agreements in New York law.  Assent to an agreement can be manifested if a party is prompted to click "accept" if they agree to the stated terms of an agreement, and the party does so click. *Id.* at *9; *Moore v. Microsoft Corp.,* 293 A.D.2d 587, 587, 741 N.Y.S.2d 91, 92 (2002).

For "agreements made over the internet" in this manner, "New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance."  *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010) (summary order). In *Hines*, the Second Circuit determined that no agreement to arbitrate had been formed under New York law because that plaintiff had only accessed the website that contained the arbitration provision.  *Id.* at 24-25.  New York courts will, however, determine that an agreement to

arbitrate was formed if the "facts tend[] to show that a user would have had actual or constructive knowledge of the Terms and Conditions." *Id.* at 25. For example, courts assess whether the terms and conditions are prominently displayed or hidden and hard to find, the party had a full opportunity to read the conditions, and the party took some kind of action to indicate consent. *Id.* at 24-25 (collecting cases).

Here, the Court determines that Plaintiff had "actual or constructive knowledge" of the terms and conditions in the Agreements before clicking to accept them. *Hines*, 380 F. App'x at 25. Under the E*TRADE acceptance process, Plaintiff was not able to accept the award until he first opened the Agreements. Dkt. No. 29 at 2; Dkt. No. 19. Plaintiff was instructed to "[p]lease click to open and review each of the grant documents below, then accept or decline the grant." *Id.* Plaintiff was instructed that "[b]y clicking Accept, you agree to the terms and conditions of the Restricted Stock Units below" and that "[i]f you do not agree to the terms and conditions, click decline." *Id.* The Unit Award Agreements expressly stated that Plaintiff would be subject to certain terms and conditions if he accepted the award and stated those terms and conditions out clearly in a numbered list with the topic headings underlined. Dkt. No. 19-2, 19-3. The mandatory arbitration provisions, though not on the first page, were listed a few pages later and followed a number of important provisions central to the Agreements, such as a non-compete provision and a termination provision. *Id.*

Therefore, Plaintiff was put on explicit notice that the RSUs were subject to terms and conditions, and he was not permitted to accept until he had been given a full opportunity to read them. He then indicated consent by clicking "accept." On these kinds of facts, the Court "can infer acceptance" because Plaintiff "had knowledge of the[] Terms and Conditions or . . . an opportunity to see the Terms and Conditions prior to 'accepting' them by accessing the website."

*Hines*., 380 F. App'x at 2.  *See, e.g., Moore v. Microsoft Corp.,* 293 A.D.2d at 587 (determining that electronic acceptance had occurred where the terms and conditions "prominently displayed on the program user's computer screen before the software could be installed" and "the program's user was required to indicate assent to the [terms] by clicking on the "I agree" icon before proceeding with the download of the software.").

### 3.   The arbitration provisions in the Agreements are not unconscionable

Lastly, Plaintiff argues that even if the Agreements are valid, the Court should not enforce the arbitration provisions because they are unconscionable.

Under New York law, "a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms.'" *Ragone v. Atl. Video at Manhattan Ctr*., 595 F.3d 115, 121-22 (2d Cir. 2010) (quoting *Gillman v. Chase Manhattan Bank, N.A.* 73 N.Y.2d, 537 N.Y.S.2d, 534 N.E.2d 824 (1988)).  Generally, a Plaintiff must show an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc*., 191 F.3d 198, 207 (2d Cir. 1999).  Thus, to demonstrate that the arbitration provision is unenforceable, Plaintiff must show that it was both procedurally unconscionable, in terms of "the contract formation process and the alleged lack of meaningful choice," as well as substantively unconscionable considering "the content of the contract, per se." *Ragon*e, 595 F.3d at 121-22 (cleaned up) (citing *State v. Wolowitz*, 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983)).

Plaintiff cannot show either.  For procedural unconscionability, courts ordinarily look for major problems with the process of acceptance, such as "deceptive or high-pressure tactics . . ., the use of fine print in the contract," or "the [limited] experience and education of the party

claiming unconscionability." *Chung Chang v. Warner Bros. Entm't*, No. 19 CIV. 2091 (LAP),

2019 WL 5304144, at *3 (S.D.N.Y. Oct. 21, 2019) (citing *Gillman*, 73 N.Y.2d 1, 10-11).

Plaintiff reiterates his argument regarding assent that the arbitration provisions were "tucked

away" in documents that were largely focused on stock awards.  Again, the arbitration provisions

were not tucked away or obscured, they were in the middle of a list of important terms and

conditions that were demarcated clearly, with underlined headings, and in numbered format, in a

document that Plaintiff was required to open and have the opportunity to review before accepting

the stock awards.  The fact that Defendant gave Plaintiff a document which was long, and

probably not enjoyable to read, is not in and of itself a "deceptive tactic," *Chung Chang*, 2019

WL 5304144 at *3, and does not render an agreement unconscionable.

       Additionally, Plaintiff claims that, as a layperson, "it would be unreasonable to expect

Plaintiff to understand that his acceptance of stock awards would extinguish his right to pursue

legal claims of defamation and employment discrimination and retaliation in state or federal

court." Dkt. No. 28.  Whether or not Plaintiff would have expected that an arbitration provision

would be required as a part of his acceptance of the stock award is beside the point.  The

Agreements stated expressly, in terms that any layperson would understand, that "any dispute or

claim arising out of or in any way related to . . . the Participant's employment with the

Company," would be covered, and therefore, Plaintiff should have known that these claims

would be subject to arbitration when he was given the opportunity to read the Agreements.

       Nor are the arbitration provisions substantively unconscionable.  Under New York law,

"[a]n agreement is substantively unconscionable if it is so grossly unreasonable as to be

unenforceable according to its literal terms and those contract terms are unreasonably favorable

to the party seeking to enforce the contract."  *Isaacs v. OCE Bus. Servs., Inc.,* 968 F. Supp. 2d

564, 569 (S.D.N.Y. 2013) (citing *Lawrence v. Miller*, 11 N.Y.3d 588, 594, 901 N.E.2d 1268, 1271 (2008)). Plaintiff argues that the arbitration provision is unreasonably favorable to Defendant because (1) it effectively mandates that arbitration occur in Pennsylvania, which would require Plaintiff to travel significant distance from New York City, and (2) unlike Plaintiff, the provision allows Defendant to "pursu[e] court action for the purpose of obtaining temporary restraining order or other injunctive relief to enforce any restrictive covenants the [Plaintiff] has with or for the benefit of the company." Dkt. No. 19-3.

Importantly, New York law does not require that the arbitration provision be *equally* as favorable to Plaintiff, but that it not be "*unreasonably* favorable" to Defendant. *Isaacs,* 968 F. Supp. 2d at 569 (emphasis added). Plaintiff has not made this showing. First, traveling to Pennsylvania for arbitration should not be an unreasonable (nor unexpected) burden for someone who accepted a job from an employer that was based Pennsylvania and worked in Pennsylvania, apparently six days a week. *See* Dkt. No. 11. Nor does the travel requirement present a "likelihood that [Plaintiff] will incur such considerable arbitration costs that [he] will be prevented from vindicating [his] statutory rights." *Martin v. SCI Mgmt. L.P.*, 296 F. Supp. 2d 462, 468 (S.D.N.Y. 2003). Indeed, Plaintiff neglects to mention that the "Company shall bear the administrative, filing and forum costs of the arbitration." Dkt. No. 19-3.

Finally, Defendant's ability to seek injunctive relief to enforce any "restrictive covenants" also does not render the arbitration provisions unreasonably unfavorable to Plaintiff. Considering that this carve out is very limited in both scope and remedy, and that Defendant otherwise obligated to arbitrate its claims against Plaintiff, *see* Dkt. No. 19-3, the Court does not find that the arbitration provisions are "unreasonably favorable to the employer." *Isaacs*, 968 F. Supp. 2d at 569 (S.D.N.Y. 2013).

* * *

Therefore, the Court determines Plaintiff electronically executed the Agreements and that the arbitration provisions in the Agreements are valid and enforceable under New York law.

### B.  The Arbitration Provisions in the Agreements are Subject to the FAA

Aside from the issue of whether a valid contract was formed, Plaintiff maintains that it is not subject to the FAA.  Plaintiff contends that the FAA "governs arbitration provisions contained within employment contracts and arbitration agreements," and argues that in this case, the "arbitration provisions presently at issue are not contained within an employment contract nor arbitration agreement."  Dkt. No. 28 at 5-6 (quoting *Sinnett v. Friendly Ice Cream Corp.,* 319 F.Supp. 2d 439, 443 (S.D.N.Y. 2004)).  However, the language used by Plaintiff to describe the scope of the FAA is nowhere to be found in the FAA, but instead was quoted from a non-binding opinion in which the court was describing, in highly general and non-exclusive terms, the basic purview of the statute.  The Court is bound to follow the language of the FAA, which includes broadly any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract."  9 U.S.C. § 2.  In executing the Agreements, Plaintiff agreed "to settle by arbitration a controversy thereafter arising out of" the Agreements. *Id.*  While the *scope* of the arbitration clauses in the Agreements is a separate question, which is addressed below, undoubtedly these contractual agreements to arbitrate are subject to the FAA.

### C.  The Scope of the Agreements Cover Plaintiffs' Claims

As the Court has determined that Plaintiff entered into binding agreements to arbitrate that are subject to the FAA, the Court must consider whether the agreements require arbitration of the claims in Plaintiff's complaint.  In interpreting the scope of the arbitration agreement, Courts "must give 'due regard . . . to the federal policy favoring arbitration' and resolve

'ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration."
*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12 CIV. 5651 AJN, 2014 WL 1172581, at *2
(S.D.N.Y. Mar. 21, 2014) (quoting *Volt Info. Scis, Inc. v. Bd. of Trustees of Leland Stanford
Junior Univ.*, 489 U.S. 468, 475–76 (1989)).  Indeed, "an order to arbitrate 'should not be denied
unless it may be said with positive assurance that the arbitration clause is not susceptible of an
interpretation that covers the asserted dispute.'" *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361
(2d Cir. 1993) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363
U.S. 574, 582-83 (1960)).

Here, the broad language of the mandatory arbitration provisions undoubtedly covers
Plaintiff's claims.  Plaintiff agreed to arbitrate "any dispute or claim arising out of or in any way
related to (i) the Participant's employment with the Company, and/or (ii) this Agreement or any
breach hereof, this Award, the Plan and/or any actions taken under the Plan."  Dkt. No. 19-3.
Plaintiff's claims against Defendant for discrimination, retaliation, and defamation, all of which
are related to Plaintiff's purportedly unlawful termination, are readily covered by the terms
"arising out of or in any way related to . . . the Participant's employment with the Company."  *Id.*

Additionally, it is well-settled that "arbitration clauses may cover statutory claims even if
the 'clause at issue does not mention [the specific] statutes or statutes in general.'" *Thomas v.
Pub. Storage, Inc.,* 957 F. Supp. 2d 496, 500 (S.D.N.Y. 2013) (citing *Mitsubishi Motors Corp.*,
473 U.S. 614, 615 (1985)).  Claims for employment discrimination and retaliation under Title
VII, NYSHRL, and NYCHRL are arbitrable.  *See id*; *Chen-Oster v. Goldman, Sachs & Co.*, 449
F. Supp. 3d 216, 244 (S.D.N.Y. 2020) (citing *Casilla v. Philip & Jack Hirth Management*, 563 F.
App'x 85, 86 (2d Cir. 2014)).  Plaintiff's claims are therefore within the scope of the arbitration
provision even though the "arbitration policy [did] not specify that discrimination and wrongful

termination claims are subject to arbitration," because it referred "generally to final and binding arbitration arising out of the employment relationship." *Thomas,* 957 F. Supp. 2d at 500 (cleaned up).

Similarly, Plaintiff's defamation claims, which concern "statement[s] . . . concerning the reasons for plaintiff's termination," are "integrally linked to plaintiff's employment" and therefore fall directly within the scope of the above arbitration provision. *Feinberg v. Oppenheimer & Co.*, 658 F. Supp. 892, 893 (S.D.N.Y. 1987) (arbitration provision applied to "any dispute, claim, or controversy that may arise between" plaintiff and his employer.). *See also* <u>Barr v. Sullivan</u>, No. 09 CV 5238 (RPP), 2009 WL 4030826, at *3 (S.D.N.Y. Nov. 20, 2009) (allegedly defamatory statements concerning the nature of Plaintiff's leaving the company were arbitrable because courts have "consistently construed such arbitration clauses covering all controversies 'relating to' employment relationships very broadly."). Therefore, Plaintiff's defamation claim is arbitrable as well.

Plaintiff nonetheless argues that his claims are outside the scope of the Agreements despite this broad language. According to Plaintiff, the Agreements provide terms and conditions related to participation in the stock incentive plan, not Plaintiff's employment. Plaintiff highlights in particular that one of the Agreements specifically states that the RSU's themselves are "outside the scope of the Participant's employment contract." Dkt. No. 28 at 11. Therefore, because the Agreements did not concern Plaintiff's employment generally, Plaintiff argues that his discrimination, retaliation, and defamation claims did not "originate under" the Agreements. *Id.*

This argument faulters against a core tenant of federal arbitration law. As the Supreme court has held, the FAA requires that "courts must treat the arbitration clause as severable from

the contract in which it appears, and thus apply the clause to all disputes within its scope" if the clause is valid and enforceable. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (cleaned up). The scope of an arbitration clause in a contract is therefore defined solely by the terms of the arbitration clause, not by the remaining content of the contract.

And Plaintiff identifies no source of law for his contention that an arbitration provision necessarily be included in a primary employment contract document for it to cover employment-related disputes. To the contrary, courts enforce arbitration clauses covering employment disputes in this exact type of agreement. In *Chen-Oster v. Goldman, Sachs & Co*., the Court determined that where an equity agreement (in which employees also received grants of "Restricted Stock Units") had an arbitration provision that covered "[a]ll claims arising out of or relating to my employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of my employment relationship with the Firm," the parties were required to arbitrate "essentially any possible type of employment-related dispute between the signatories, including claims for discrimination under Title VII and the NYCHRL." 449 F. Supp. 3d 216, 243 (S.D.N.Y. 2020). *See also Guyden v. Aetna, Inc.,* 544 F.3d 376, 380-81 (2d Cir. 2008) (discussing the scope, and assuming the validity of, an arbitration clause contained in a stock incentive plan which stated that "Grantee has accepted the stock option award and agrees to be bound by all its terms and conditions including mandatory binding arbitration of employment related disputes.").

Therefore, the question is not whether the Agreements were "employment contracts," but whether they contained an agreement to arbitrate any claims arising out of Plaintiff's employment. *See Patterson v. Raymours Furniture Co*, 96 F. Supp. 3d 71, 78 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 40 (2d Cir. 2016) (enforcing an arbitration provision that was in an employee

handbook, one which expressly stated that it was not an employment contract, because "[a]lthough the Handbook does not impose contractual obligations on Defendant, the arbitration provisions are nonetheless binding on Plaintiff.").  As discussed above, there is no genuine dispute of fact that Plaintiff agreed to arbitrate and the arbitration provision covers the claims in his complaint.

### D. A Stay is Appropriate

Because the Court decides that all of the claims must be referred to arbitration, the Court must issue a stay if a stay is requested.  *Katz*, 794 F.3d at 345.  Defendant does not make clear in its briefings whether it is requesting a stay or dismissal. Nevertheless, the Court will stay this case pending arbitration.  Even if a stay is not requested along with a motion to compel arbitration, a court has the discretion to dismiss the case or issue a stay. *See Charter Commc'ns, Inc.,* 2021 WL 694549, at *14; *Benzemann,* 622 F. App'x at 18.  The Court will issue a stay instead of dismissal because a "stay would [] allow the Court, at a later stage, to address any claim or lingering issue that is not resolved in arbitration."  *Charter Commc'ns, Inc*, 2021 WL 694549, at *14.

### III.    CONCLUSION

For the above reasons, Defendant's motion to compel arbitration is GRANTED and its requests to dismiss or transfer the case on alternative grounds are denied as moot.  This case is stayed pending the parties' arbitration.  This resolves Dkt. No. 18.

SO ORDERED.

Dated:  March 30, 2021
        New York, New York

_____
ALISON J. NATHAN
United States District Judge